WOODMEN OF THE WORLD v. FANNIE GILLILAND.

(Filed January 13, 1902.)

1. **EXPULSION.** While it is true that fraternal insurance societies have the power to expel a member, such expulsion must be in strict accordance with the rules of the society, and in the manner prescribed by its constitution, and where it is shown that the expulsion of a member was without jurisdiction or contrary to the rules or in violation of the constitution of the society, or in violation of the terms of the certificate of insurance, such expulsion is null and void, and it is not incumbent on such member to take steps to have it reversed or set aside.

2. **INSANE MEMBERS.** Under a provision of the constitution of a fraternal life insurance society, which provides that: "Upon satisfactory evidence of at least two physicians that a beneficiary member of this order is insane and totally incapable from such insanity, to attend to the payment of his assessments and dues, and in addition thereto financially unable to pay the same, the camp of which he is a member shall pay the same from its general fund, or if a member-at-large, then the sovereign camp, or beneficiary head camp of his jurisdiction shall pay from its general fund all arrear-

ages since he became insane or incapable; provided that he shall not have been in arrears more than three months. And provided further that in case of the insanity of any member financially able to pay his assessments and dues, the sovereign clerk, head clerk, or clerk of his camp, as the case may be, shall, within thirty days after knowledge thereof, notify in writing and under the seal of the camp, the guardian or conservator of said insane member, and the beneficiary or beneficiaries named in the certificate of said insane member, the fact of his insanity and the amount of his assessments and dues unpaid by him, and require payment thereof forthwith, and if the same be not paid within sixty days thereafter, and also thereafter continue the payment of assessments and dues within the time prescribed by the constitution and laws of the order, then, and in such case, the beneficiary certificate shall become cancelled, and held as of no validity against the order." Three distinct classes of members are provided for. Under the first part of said section provision is made for a class known and described as those who are insane, and from such insanity incapable of attending to the payment of assessments and dues, and in addition to such incapacity are financially unable to pay the same; and in the second part of this section is classed what is known as members-at-large, who are members admitted by dispensation of the superior or head camp, where the local camp has been dissolved, and who pay assessments to the head camp; and by the last part of said section another and entirely different class of members is provided for, that is, those members, who, although insane, are financially able to pay their assessments and dues, and before one coming within the provisions of the latter clause can be legally expelled from the society, so as to cancel his beneficiary certificate, all of the requirements and conditions made necessary to be performed by the society must be complied with, and if the notice required by, and the time of payment provided for in said section be not given, such beneficiary certificate cannot be cancelled by the society. Such notice and time are conditions precedent to the right of the society to cancel such certificate.

3. INTEMPERANCE—Use of Opiates. Under the provision of the constitution of a society: "If the member holding this certificate shall become so far intemperate, or use opium, cocaine or chloral to such an extent as to impair his health, * * * * * or should die from disease resulting from his own vicious or intemperate or immoral habits * * * * * this certificate shall be null and void * * *," an instruction that: "The burden is upon the defendant to prove by a preponderance of the evidence that deceased was' addicted to the use of cocaine or other drugs mentioned in the policy, or beneficiary certificate, to such an extent as to impair his health, or that his death was occasioned from a disease resulting from his own vicious, intemperate or immoral habits, but the impairment of deceased's health from the use of such drug must have existed to such an extent that if it had not been for the result produced from the use of such drug, the deceased would not have died at that time." is not reversible error. The latter part of this instruction

—25

will be treated as merely descriptive of what is meant by "impairment of health."

4. **CONSTRUCTION OF RULES.** In construing the rules and laws of a fraternal insurance company the court will put upon them a liberal construction, and give to the language such meaning as will tend not to defeat, but rather to carry out the manifest intention of the parties, and will promote the object of the issuing and acceptance of the certificate, consistent with the rules, regulations and requirements of the society, and if a provision of the certificate of the constitution of the society is susceptible of two reasonable constructions, one sustaining and one defeating the certificate, the former will be adopted.

(Syllabus by the Court.)

*Error from the District Court of Oklahoma County; before B. F. Burwell, Trial Judge.*

*Brome & Burnett* and *Maxey & Crafton,* for plaintiff in error.

*H. H. Howard* and *C. B. Ames,* for defendant in error.

STATEMENT OF FACTS.

This is an action commenced in the district court in and for Oklahoma county, Oklahoma territory, September 21, 1899, by Fannie Gilliland, plaintiff, against the Woodmen of the World, defendant. The petition alleges that the defendant is a corporation, organized and legally chartered, in the state of Nebraska, being an order composed of a sovereign camp, beneficiary head camps, and certain subordinate camps, having for its object, among other things, to combine white male persons of sound bodily health, exemplary habits and good moral character, between the ages of eighteen and fifty-two, into a secret, fraternal, beneficiary and benevolent order, and containing among other provisions that upon the death, of any beneficiary member,

who has complied with the lawful requirements of the order, there shall be paid a sum not to exceed three thousand dollars, to the person or persons named in his certificate as beneficiary or beneficiaries, which beneficiary or beneficiaries shall be his wife, children, adopted children, parents, brothers, sisters or other relatives. It is further alleged in said petition that prior to March 8, 1898, one C. C. Gilliland, the son of the plaintiff, was a member of said order and had paid all sums required of him as such member, that his local camp was Choctaw Camp No. 132, one of the local camps of said order located at Choctaw City, Oklahoma county, Oklahoma territory, and that as such member there was duly issued to him a certificate duly subscribed and sealed, under date of March 8, 1898, in and by which the plaintiff was named the beneficiary, and by the terms of which the defendant undertook, promised and agreed to pay her the sum of one thousand dollars upon the death of said member, and on March 6, 1899, at Luther, Oklahoma county and Oklahoma territory, and more than one year after he became said member, the said C. C. Gilliland died. That after he became said member and up to the time of his death, said C. C. Gilliland paid all sums and did all acts required of him as such member, in order to keep such certificate in force. And that in consequence and by virtue of said certificate, there is now due the plaintiff from the defendant, the sum of one thousand dollars, together with the interest thereon at the rate of seven per cent per annum from March 6, 1899, and costs of this suit.

To this petition the defendant filed a motion with the court to strike out the second and third paragraphs of plaintiff's petition. Said motion was overruled by the

court. After which the defendant, on the 20th day of October, 1899, filed a general demurrer to the petition, which was by the court overruled. Afterwards on the 28th day of November, 1899, the defendant filed its answer to the petition of the plaintiff. By said answer it denies each and every allegation of plaintiff's petition, says it is not liable to the plaintiff as alleged in said petition, or on any other account. It admits by said answer that it is a corporation, and legally chartered under the laws of the state of Nebraska, and that it is a secret order, organized under the provisions alleged in the first paragraph in plaintiff's petition, and the defendant also admits that one C. C. Gilliland became a member of one Choctaw Camp No. 132, one of the local camps of the defendant, and that a certificate was issued to him as alleged in said petition, but it says that by reason of said C. C. Gilliland's failure to comply with the constitution and the laws of said defendant, his certificate became forfeited, and was, at the time of his death of no force and effect, whatever.

And further answering the defendant denies any and all liability to the plaintiff under and by virtue of said certificate. The case was tried in the district court in and for said Oklahoma county, Oklahoma territory, by a jury, in the presence of and under the instructions of the court at the April term thereof, 1900, and a verdict found in favor of the plaintiff, and against the defendant, in the sum of one thousand seventy-four dollars and twenty cents. A motion for a new trial having been regularly and legally made, was overruled by the court, and judgment rendered on the verdict. Defendant assigns the action of said court as error, and brings the cause here for review.

Opinion of the court by

IRWIN, J.: While there are numerous assignments of
error in this case, the counsel for plaintiff in error have in
their brief condensed them, and narrowed the argument to
but two central, objective points, and we will follow this
plan in our discussion of the case. Counsel say "the first
question is, it being an admitted fact in the case that Gilli-
land was suspended on the first day of March, 1899, for
non-payment of the February assessment, and being sus-
pended at the time of his death, can plaintiff recover?" Let
us briefly consider the question, and ascertain from the
record and the evidence in the case, what the correct
answer thereto should be. Section one hundred and thirty-
one of the constitution of the defendant company which is
made a part of the beneficiary certificate, and the contract
of insurance, is as follows:

"Upon satisfactory evidence of at least two physicians,
that a beneficiary member of this order is insane, and
totally incapable from such insanity to attend to the pay-
ment of his assessments and dues, and in addition thereto,
financially unable to pay the same, the camp of which he
is a member shall pay the same from its general fund, or
if a member at large, then the sovereign camp or beneficiary
head camp of this jurisdiction shall pay from its general
fund all arrearages since he became insane or incapable;
provided he shall not have been arrears more than three
months. And provided further that in case of the insanity
of any member financially able to pay his assessments and
dues, the sovereign clerk, head clerk or clerk of his camp,
as the case may be, shall, within thirty days after knowl-
edge thereof, notify in writing and under seal of the camp,
the guardian or conservator of said insane member, and the
beneficiary or beneficiaries named in the certificate of said

insane member, the fact of his insanity and the amount of his assessments and dues, unpaid by him, and require payment thereof forthwith, and if the same be not paid within sixty days thereafter, and also thereafter continue the payment or assessments, and dues within the time prescribed by the constitution and laws of the order, then, and in such case, the beneficiary certificate shall become cancelled, and held as of no validity against the order."

Now this section manifestly makes provision for three distinct classes of members, (1,) those who are insane, and from such insanity incapable of attending to the payment of assessments and dues, and in addition thereto are financially unable to pay. (2), What is known as members-at-large, (of this class we have nothing to do in this case), and, (3), members who are insane, but are financially able to pay. In the first class herein referred to, when such members are so unfortunate as to become in arrears in assessments or dues, provision is made whereby the same can be paid, out of the general fund, provided he shall not be behind beyond a limited term, to-wit, three months. For this class provision is made in the first part of section 131. But when we come to read the latter part of this section, it will be readily seen that an entirely different and distinct class of members is mentioned, described and provided for, to-wit, insane members financially able to pay their assessments and dues, and as to such members a different provision is made, and the manner of dealing with them in case they are in arrears is entirely different, and the section clearly points out the way in which the beneficiary certificate of such member can be cancelled. This section, like a statute, must be construed in accordance with its express terms, and when a way is pointed out for the can-

cellation of a certificate, and the manner of procedure in such case is clearly expressed, this way must be followed to the exclusion of all others. Such provision should be construed most strongly against the party seeking to defeat the certificate. If the language used is capable of two equally reasonable constructions, that one should be adopted which will sustain, rather than the one which will defeat the object of the certificate. Certificates of insurance should not be cancelled, or the right of a beneficiary forfeited, for reasons which are purely technical. But we think the language of this section is susceptible of but one rational and reasonable construction. It provides in clear, concise and express terms, what the society must do, before the certificate of insurance shall become cancelled. What must they do? "The sovereign clerk, head clerk, or clerk of his camp, as the case may be, shall, within thirty days after knowledge thereof, (the insanity of the member,) notify in writing, and under the seal of the camp, the guardian or conservator of such insane member, and the beneficiary or beneficiaries named in the certificate of such insane member, the fact of his insanity, and the amount of assessments and dues unpaid by him, and require payment thereof forthwith, and if the same be not paid within sixty days thereafter, and also thereafter continue the payment of assessments and dues within the time prescribed by the constitution and laws of the order, then and in such case the beneficiary certificate shall become cancelled, and held as of no validity against the order."

Now, was the insured in this case insane? Of this fact the proof, leaves no room for doubt, and it is conceded by both sides. Next, was he able to pay his dues and assess-

ments? That he was is one of the allegations of the petition, and it is nowhere in express terms denied. That he was is shown by the testimony of the witness, Morgan. (Record page 59.)

"Question. Well, he was still doing business then during that time, and handling money, was he not? Answer. Yes sir.

"Ques. And was able to produce a dollar or two at any time, do you know that to be a fact? Ans. Yes, sure."

And the fact is further shown from the testimony of Doctor Hughes, (Record, page 65,) where he testifies that he went to the clerk of the camp, took out the money and offered to pay the dues and assessments, and there is no proof of any kind contradicting this fact. If he was a member of the order having a certificate, was insane, and financially able to pay his dues and assessments, then, according to the terms of section 131, of the constitution, before that certificate could be legally cancelled, or he be suspended, or expelled from the order, the clerk must serve the notice therein specified, and give the sixty days for payment therein provided for. In this way and in no other could it be done. Did the clerk do so? No. Why? The plaintiff in error says because the clerk didn't have knowledge of the insanity of the member. But does the failure to give notice of insanity on the part of the member or the beneficiary suspend or expel the member or work an cancellation of his certificate, by the terms of section 131, which is the only section applicable to his case? Who was in the better position to ascertain and give notice of this fact, the beneficiary or the clerk of his camp? It is no doubt the

case many times, and from anything shown by the evidence to the contrary, may have been the fact in this case, that the beneficiary had no knowledge that the insane person was a member of the order. These certificates are generally taken out for the protection of aged fathers, mothers and children, who from their condition, age and surroundings may not be in a position to ascertain the fact of insurance, or the necessary steps to be taken to protect their rights and interest therein, and to require such beneficiary to give notice to the head camp, or the local camp, might be asking them to give notice of something they had no knowledge of, and it would certainly be a hardship to charge them with this duty, and then make a forfeiture of the policy the penalty for the failure to do so, while on the other hand the clerk of the camp has the books of the camp, which, no doubt contained a list of the members and their residence, the head camp has the original application, which always contains the name and address of the member; the clerk knows from the books that the member is in arrears, and it certainly would seem that his duty would require some attempt or some effort on his part to ascertain the cause; and his duty attended to, the insanity of the member would be ascertained. But the best argument on this question is that the order nowhere in express terms, provides that the failure to give such notice by the member or his beneficiary, shall work a fortfeiture of the certificate, and we have no right to interpolate such a meaning into it. The class of members described in the first part of section 131, to-wit, those who are insane, and also financially unable to pay their assessments and dues, are, to a certain extent, treated as subjects of charity. For such members, not simply because they are insane, but because they

are financially unable to pay, the camp will make payments, and in such case, if the arrears do not exceed three months, the purely charitable office of the order will take charge of the case. The second part of section 131, also applies to insane members, but only such as are financially able to pay their assessments and dues. Here the case is different, the member may be an object of indulgence and sympathy, perhaps, but certainly not of charity. He is able to pay and presumed to be willing, but not capable, mentally, of giving attention to the matter. Consequently he is shown indulgence. The beneficiary is reasonably presumed to be able and willing to pay, and to desire only the opportunity. Honesty and fair dealing would dictate that before the order could cancel the certificate of such a member and thus defeat the object and purpose of his insurance, a reasonable effort should be made to satisfy the demands of the order out of his property.

Cousel for plaintiff in error cite us to the 29 Pac. Rep. page 473, the 30 Pac. page 460, and the 31 Pac. page 733, as sustaining their contention in this case. These authorities all cite the same case. *Modern Woodmen of America v. Jameson,* first decided in the supreme court of Kansas, March 5, 1892, reported in 29 Pac. 473. A rehearing was granted, and the case again decided July 8, 1892, and reported in the 30 Pac. 460; a second rehearing was granted, and the case again decided, November 5, 1892, and reported in the 31 Pac. 733. But we think these authorities are not in point, for the reason that the constitution and certificate issued by the Modern Woodmen of America, contains no such provision as is contained in section 131 of the constitution under consideration, nor any-

thing similar thereto.  We have made diligent and careful search, and have been unable to find a provision similar to this in the constitution or laws of any other fraternal or benevolent order.  None of the cases cited, and no adjudicated case we have been able to find, after a careful search, has been passed upon under such provisions.    It seems that in this particular this order stands alone; hence, none of the cases attempt to construe the language herein used, and we get no substantial aid or assistance in the decision of this case.

To   come   back  to  the  question  propounded by the counsel,   at   the   threshhold of their brief, to-wit:   Was Gilliland suspended at the time of his death? When viewed in the light of section 131, we are compelled to answer, No. He was not legally suspended, because he was not suspended in the manner required by section 131 of the constitution, which is a part of the certificate issued to the member by the defendant, and is a part of their contract of insurance, that may be and is binding on the order; and hence, any attempt the order may have made to suspend him in the month of March, 1899, for non-payment of the February assessment, or to cancel his beneficiary certificate for that reason, was null and void, and the member was under no obligation to take any steps to set aside or vacate the same.

Neither do we think the defendant society can complain that  this rule is a harsh one, as it is one made by themselves.   They made this constitution containing all the provisions including the one contained in section 131; they made it a material and vital part of the certificate

issued to Gilliland, and a material and vital part of the contract of insurance with him, and if they wish now to hold this beneficiary to the Shylock letter of the rule, they cannot reasonably complain if justice is meted out to them in kind. If they take their pound of flesh, they must abstain from drawing christian blood not included in the strict letter of their contract. This one feature of the order may have been the one of all others which induced the member to join. This may have been its chief recommendation to the public, its strongest drawing card. Now to hold that an order might recommend itself to the public, because of this feature of insurance, and then shirk responsibility, and ask to be relieved from liability, when such feature becomes unprofitable to them, is unreasonable. The defendant is only held by the terms of a law which it has made for itself. If the position of plaintiff in error was tenable, that is, if immediately upon failure to pay assessments and dues, the certificate of a member became invalid, and of no effect, what sense or meaning would there be in the language of section 131, "And if the same be not paid within sixty days thereafter * * * * then and in that case the beneficiary certificate shall become cancelled * * * * * *?" What sane, rational human being would ever write or insert such language into the constitution of a benevolent order, if the simple non-payment of dues or assessments of a member suspended him and forfeited the rights of the beneficiary under the certificate? Such a construction is too ridiculously absurd to be considered for a moment. It is another illustration of the old adage, "It makes some difference whose ox is gored." This section is a good thing to catch new members with, but will never do to pay losses by. The rule herein laid down does not in

any way militate against the well established and universal rule, that where no special rules were adopted, and no special exceptions made, failure to pay assessments or dues suspends the member, that such provisions are self-executing, and that sickness or insanity are no excuse; and the cases cited by plaintiff in error lay down this rule, and we fully agree with it. (*Rood v. Benefit Ass'n,* 31 Fed. 62; *Maderia v. Benefit Soc.* 16 Fed. 749; *Hawkshaw v. K. of H.* 29 Fed. 473; *Modern Woodmen v. Jameson,* 29 Pac. 473 )

But these were all cases where orders made no exception in favor of sick and insane members. The Modern Woodmen makes no exception for insane members, and leaves it entirely to local camps, to look after and provide for sick ones. In this opinion we are not holding this order to anything more, other or different than the assurance it gives to all who join it. Binding it by no rule or no law it has not made for itself, we are not overriding the rules and laws of the order in the name of good conscience, or for humanity's sake, but are enforcing the rules and laws it has made in the name of common honesty.

The second question presented for our consideration by the plaintiff in error, is, had Gilliland forfeited his certificate by the use of cocaine? The section relating to this subject is the fifth subdivision of section 38 of the constitution of the Woodmen of the World, and reads as follows:

"If the member holding this certificate shall be convicted of a felony, or shall be expelled from the order, or become so far intemperate, or use opiates, cocaine, or chloral, to such an extent as to impair his health, or to produce delerium tremens, or should die in consequence of

a duel, or while engaged in war, or by his own hand or act, whether sane or insane, or by the hands of the beneficiary or beneficiaries named herein, except by accident, or by the hands of justice or from a disease resulting from his own vicious intemperate or immoral habits, or in consequence of the violation or attempted violation of the laws of the state or of the United States, or of any other province or nation, or if any of the statements or declarations in the application for membership, and upon the faith of which this certificate was issued, shall be found in any respect untrue, this certificate shall be null and void and of no effect, and all moneys which shall have been paid and all rights and benefits which may have accrued on account of this certificate, shall be absolutely forfeited without notice or service."

The question as to whether the member used cocaine to such an extent as to impair his health, was purely one of fact, for the jury to determine from the evidence. The plaintiff in error claims the fact is established beyond any controversy by the evidence. We have carefully examined the entire evidence, and cannot agree with this statement. We fail to find a single witness who swears that he ever saw him take cocaine, or that he has any personal knowledge of the fact. Some of the physicians give it as their opinion that he used it, but most of them say that they do not know. Others base their belief that he used it by the fact that he bought it of a traveling salesman, and the further fact that they had found empty bottles which had contained cocaine, after his death at his place of business. But these circumstances lose a great deal of their force when we consider that his business was running a drug store, where such drugs were bought and sold. The courts have held that the testimony of physicians is competent in such cases, but

have nowhere held that it was conclusive. Such testimony may be weighed by the jury, but may not satisfactorily establish the fact to the jury. But, be that as it may, this was a question of fact entirely within the province of the jury, to decide. The plaintiff. in error claimed the court improperly instructed the jury as to the law. The instruction complained of is as follows:

"The burden is upon the defendant to prove by a preponderance of the evidence that the deceased was addicted to the use of cocaine, or other drug mentioned in the policy or beneficiary certificate, to such an extent as to impair his health, or that his death was occasioned from a disease resulting from his own vicious, intemperate, or immoral habits; but the impairment of deceased's health from the use of such drug must have existed to such an extent that it contributed to deceased's death, and must have existed to such an extent that if it had not been for the result produced by the use of such drug, the deceased would not have died at that time."

That part of the instruction particularly complained of is where the court tells the jury:

"That the impairment of deceased's health from the use of such drug must have existed to such an extent that if it had not been from the results produced from the use of said drug, the deceased would not have died at that time."

This portion of the instruction we think must be construed as merely descriptive of what is meant in law by the term, "impairment of health," and would be so understood by the jury.

It is patent from the reading of the constitution of the

order, from subdivision five of section 58, and from the certificate in this case, that the limitation as to the use of drugs was intended to guard against and protect the society from the physical effect of such drug on the member, and to protect the order from an extra hazardous risk on account of intemperance, or the use of drugs in its members, and was not designed to afford protection to the order as against the moral effect upon its members. If it had been the intention of the order to guard against objectionable or immoral persons becoming members of the order, they would, as they had the undoubted right to have done, made the use of the drug in any degree a cause for expulsion, or would have made all persons addicted to the use of such drug ineligible as members. This society being a fraternity or brotherhood, the order would have the right to make all necessary and reasonable rules and regulations to elevate and keep up a high standard of morals among its members, and to provide that none but those who were and would continue to be persons of high moral character, temperate and reputable, should become or remain members. As was said by Lord Coleridge, in the case of *Southcombe v. Merriman,* Car. & M. 286, cited in the A. & E. Enc. of Law, (note 9,) page 639:

"The society has a right from many motives of their own to act upon what rules they please, and to stipulate, as in this case, that, even though a man's health be not impaired, every person whose life is insured at their office shall be a person of temperate habits."

So it seems to us that it is apparent that it was only the physical effect of the drug, and not its moral effect, that the section was aimed at, and hence the language, "to such an extent as to impair his health."

If it had been the moral effect, its use would have been entirely prohibited.

Now, what is impairment within the meaning of this section of the constitution, and the certificate?

We think it reasonable to say it is that condition of health which would enhance or increase the hazard of the insurance company. It will not be presumed that the company were seeking to protect or insure against his own vicious habits, and save him from any pains he might suffer from the use of cocaine, unless such pains in some way affected the rights or interests of the company, or in some degree contributed to its injury. This law of the order was intended as a protection to the order. In seeking to construe a law, one of the principal guides is to ascertain if possible the object the lawmaking power had in view. In making this rule, the order was seeking to fix and define the rights of the other contracting parties. This was a contract of insurance. The order adopting this section of the constitution was one party to the contract, the insured was the other party. Now it will be presumed the insured at the time of making the contract was fully capable of looking after and protecting his own rights in the contract, hence we have a right to presume that the order in making this section were seeking to protect themselves. If so, what would it be reasonable to suppose it meant and intended by the provision against using cocaine to the extent of impairing his health? The order was not financially or pecuniarily interested in the health of the insured, only as it tended in some degree to affect its interests, by increasing the hazard assumed by it. The liability of the order

only accrued at the death of the member. Any impairment of health which could possibly affect the interests of the insurance company, must to some degree cause or hasten the event which would cause it to pay the certificate, towit: The death of the member. The order was not called upon by this certificate to pay the one thousand dollars mentioned therein, when or because the member was sick, or because his health was impaired, but their liability depended solely upon his death. In that event and no other was it to pay, hence, any sickness or impairment of health, which did not in any degree hasten, cause or contribute to that effect, would not in any way affect the interest of the company. In other words, if the deceased lived just as long with, as he would have without the drug, then the interest of the company was not in any way affected by the use of such drug. Suppose, for illustration, in the place of spinal meningitis, it had been a stroke of lightning that caused the death of the member. Would it be insisted that the company could defend because the deceased had used cocaine? We think not, for the very good reason that the use of the drug could not have in any way affected the risk of the company, or rendered its payment any more speedy, than it otherwise would have been. Hence we take it to be a reasonable construction of the language used, that the order only intended to protect itself against such a use of drugs as would cause an impairment of health, tending in some degree to make death more imminent, or life more uncertain. It is not reasonable to suppose that the order in making this provision was seeking to protect anything but its own interests, and what they intended to provide for by this provision of the constitution, was, that by the intemperance or the use of drugs, the insured should

not have prejudicially affected the interests and rights of the order, and this is all that is meant or intended by the provision prohibiting intemperance or the use of cocaine, or other drugs to the extent of impairing the health of the insured, and the instruction complained of only stated this rule of construction to the jury, and consequently was not erroneous. Counsel for plaintiff in error cite to sustain their contention that this instruction was error, vol. 13 A. & E. Enc. of Law, 1st Ed. page 69, but an examination of this authority will show that the provision under consideration there was: "That if the insured shall become intemperate in his habits, the policy shall be void"; being the case of *Miller v. The Mutual Benefit Life Insurance Company,* 31 Iowa, 216, which is a very different provision from the one in this case. This provision construes itself, and hence has no application to the case at bar.

They also cite *North Western Mutual Life Insurance Co. v. Hazelett,* 105 Ind. 212, also found in 35 Amer. Rep. 192. In this case while the ·contract of insurance contained a provision very similar to the one in the case at bar, it also contained another provision, which made the policy not absolutely void, but only voidable, at the will of the company, and the court in this case do not attempt to give a construction of this provision, but only discuss the question as to which of these provisions should control. Hence this case does not sustain or tend to sustain the contention of plaintiff in error. But it does contain, however much valuable law applicable to this case. We believe that the true rule of construction in cases like this, is that the court will give to the language such a liberal construction as will tend rather to sustain than to defeat the certificate,

consistent with the laws and rules of the order; that beneficiary certificates of insurance having been designed for the relief of those who are needy and helpless, should not be defeated of their purpose, on grounds and for reasons which are purely technical; that a forfeiture will not be enforced unless it is clearly demanded by the rules governing the construction of written agreements. When a policy of insurance contains inconsistent or contradictory provisions, it is the rule that the provisions most favorable to the insured will be adopted. (*Mouler v. American Life Ins. Co.* 111 U. S. 335; *National Bank v. Ins. Company,* 95 U. S. 673.)

Courts will construe a contract of insurance liberally, so as to give it effect rather than to avoid it. Conditions which create forfeitures will be construed most strongly against the insurer. Only a stern legal necessity will induce such a construction as will nullify the policy. (*Carson v. Jersey Ins. Co.,* 43 N. J. Law, 300; *Franklin Life Ins. Co. v. Wallace,* 93 Ind. 7; Bliss on Life Ins. section 385.)

In the case of *North Western Mutual Life Insurance Co. v. Hazelett,* above cited, the Indiana court says:

"The policy before us having been presumably prepared by the company and containing on its face inconsistent or ambiguous stipulations as to the consequences which should result from intemperance, the meaning most favorable to assured must be attributed to it."

In the case of *Burkhard v. Travelers Ins. Co:,* 102 Penn. Sta. 262, the court says:

"When a party uses an expression of his liability having two meanings, one broader and the other more narrow,

and each equally probable, he cannot after acceptance by the other contracting party, set up the narrow construction."

It is repugnant to our sense of justice to allow the insurance company in this case to defeat the object of this insurance, and declare a forfeiture of this certificate, on grounds which are purely technical, and on account of alleged violations of the terms of the policy, which did not in any way injure the company, or in any degree affect its rights or interests.

Finding no error in the record, the judgment of the court below is affirmed.

Burwell, J., who presided in the court below, not sitting; McAtee, J., not sitting; all the other Justices concurring.